Our next case for argument is Tucson v. City of Seattle Now we understand the confusion about tables. Thank you very much. After the next case, can we take a brief break. Absolutely. Thank you. May it please the court. Carolyn Howard for the appellants. I'd like to reserve five minutes for rebuttal. The district court's numerous erroneous rulings and accumulation deprived these officers of a fair trial. Several key rulings are reviewed de novo. The court's erroneous reliance on First Amendment forum analysis to deny summary judgment on retaliatory arrest. A legal analysis so flawed that affirming it would largely nullify the Nieves v. Bartlett exception. The related erroneous jury instruction number 19 regarding an important disputed fact. It stated that officers typically don't arrest for chalking on sidewalks or walls and amounted to a de facto directed verdict for plaintiffs. The court denied judgment as a matter of law, relying on evidence about non-party officers and the general atmosphere in Seattle as evidence of the defendant's state of mind. Other rulings further undermined fairness. Divisive, prejudicial political views of non-party and defendant officers were allowed as evidence against the defendants. Highly prejudicial testimony from witness Cadman Cahill was based on rumor and innuendo rather than personal knowledge. The court described a courthouse mural as a tagging wall to the jury, legitimizing the plaintiff's conduct. The court enjoined the city's graffiti ordinance as unconstitutional, which this court reversed. Yet the district court awarded attorneys fees for that failed effort. I will begin with the incorrect legal standard used to deny summary judgment. Affirming here would largely nullify the slim exception under Nieves and Gonzalez. The district court used First Amendment forum analysis to conclude as a matter of law that the wall plaintiffs chalked and charcoaled on was indistinguishable from a sidewalk. The city has a policy to allow chalking on sidewalks, and based on that, the district court applied the Nieves exception to plaintiff's arrest for chalking and charcoaling on a wall. By that logic, a retaliatory arrest claim for charcoaling on a courthouse wall would survive summary judgment. The district court also reversed the burden of proof and relied on its finding that the defendants didn't present enough evidence of similar arrests. Under the district court's extreme opinion, the slim exception established in Nieves and Gonzalez would swallow the general rule that bars these claims. Counsel, the standard under Nieves is probable cause or objective evidence that the people writing with chalk or charcoal on walls and sidewalks are generally not arrested, correct? Yes, that officers typically exercise their discretion not to make arrests in similar circumstances. Wasn't there objective evidence as to that provided to the court? No, Your Honor. So under Nieves and Gonzalez, the test is whether officers declined to arrest for similar conduct. And the district court here didn't require, became sidetracked by forum analysis and didn't require plaintiffs who bore the burden to meet their requirement to present objective evidence. So what does that mean in English? Do you know what I'm saying? We got the sidewalk out there on Capitol Hill outside the police precinct and the police are writing on it and protesters are writing on it, right? And then we got the wall that's like basically a sidewalk turned perpendicular, concrete wall there adjacent to the station. So just starting there, isn't that similar conduct, chalking on that wall of that police station similar to chalking on the sidewalk outside the police station? So under Nieves and Gonzalez, the test is, is it similar? And it's our, there's ample evidence in the record that chalking on sidewalks is very common and that the police don't arrest people who chalk on sidewalks. Okay, that's a given. All right. And what about chalking on that wall outside the police station? There's no evidence like that about chalking. Evidence that it's happened but only one or so people have been arrested for it? There's evidence that graffiti on the wall is common, spray paint and chalking. Well, okay. So that's content. So first we got like we're taking the chalk and we're writing all over the sidewalk, including the police lady. Then we got the wall and there's evidence in the record that people are writing on that, right? The district court relied on evidence about sidewalks. No, I mean, I'm asking you what the record shows is that as to this wall, there's evidence that people are writing on it, whether they're writing graffiti or statements or whatever, right? Yes, there's a lot of evidence. Okay, so we got sidewalks and we got walls and people are writing all over them. So I take it your argument is that a wall is not a sidewalk. Is that the argument? Yes, that the conduct is different for many reasons. The city has a policy to allow chalking on sidewalks, but no policy like that about walls. And the city cares more about graffiti on walls than about graffiti on the ground, I think, is a matter of common sense. No, I mean, we go from policy. You can't we got a policy you can write all over the Seattle sidewalks, but there's no policy on walls. You're saying there's no evidence about it. Okay, we'll just say there isn't any evidence in the record about any policy about walls. But then you go on to say, but it's common sense that the city would care more about walls than sidewalks. Where does that come from? Well, there's also there's evidence about it. May I interrupt for one second? Because you're saying there's no evidence that people wrote on the wall. But testimony from officers showed that at the time of plaintiff's arrest, people placed graffiti and paint and chalk on the eco block wall daily. And there's sites to several points in the record where officers testified to that. There's no evidence of allowing graffiti on the wall. So what you're saying, there's no city policy one way or the other. The evidence is that officers said they would go out and arrest people when it happened. The only incident identified in the record of someone doing that resulted in an arrest. And that was about a month before the plaintiffs. So, okay, we got one person arrested for writing on the wall. Was that graffiti or chalk? That was chalk. There was the evidence in the record is that the police station cleaned it up every single day when there was spray paint and chalk on the wall. And that the officer said it was important to address. But counsel, if they were cleaning it up daily, that means daily people were putting graffiti and chalk on the wall. And there's no evidence those people daily were being arrested. I don't quite understand. What is the fine distinction that you're making here? There's no evidence that it's an activity that's rampant but under enforced. There was evidence about how, there's no evidence that people did it in front of the police. So if Nieves and Gonzalez talk about officers exercising their discretion. Let's just be practical. So the plaintiff has to introduce evidence that people did it in front of the police? Is that the plaintiff's burden or is that the city's burden? The plaintiff has the burden under Nieves and Gonzalez whether officers declined to make arrests for similar conduct. Right. And if we're talking about the evidence at summary judgment. There was evidence that there was writing on the wall. Spray paint and chalk. There's no evidence about how common the chalk was relevant to spray paint. And that the officers considered it important. And that when it was safe and feasible they would go out and address it. And the district court said the defendants did not introduce enough evidence of similar arrests. But did not require plaintiffs to introduce evidence on that. There's no evidence that this was like jaywalking. What do you mean it's like jaywalking? The Nieves example. Jaywalking is illegal. Seattle is one of the few cities where you actually can get a ticket for that. So I don't quite get the jaywalking analogy. It's the example that Nieves uses. It says the exception is slim and it applies to a situation where jaywalking is rampant but not enforced. There's not objective evidence in the record that chalking or charcoaling on walls is rampant but under enforced. Well if they go out there. Let me. I'm just really. The reason I'm struggling with it. If they go out there every day. And clean it up. And clean it up. That would be rampant. So now we go to the second part. So there's no evidence that it's rampant and not enforced. But if you. What's the evidence on the second one? Well it's one wall at this police station. It was a security wall erected because of violent. Correct. On the police station in 2020. There's no evidence about any other walls. Plaintiffs themselves testified. They marked on sidewalks nearly every day. And a couple of walls. This wall and one other police station. There's no evidence that this was happening throughout the city. There's a lot of evidence about this security wall. Becoming a flashpoint. Right. And that the police officers were instructed to keep this area clear. And the police officers talked about why it was difficult to make arrests. They would go out to make arrests when people were marking on the wall. And I think Sergeant Kennard's testimony at the trial is the best. Sort of sum up succinctly. Of why they couldn't make arrests. Frequently. The second they opened the door. People would flee. People often did it in the dark. And couldn't be seen. These plaintiffs were right in the driveway for the patrol cars. There were three security cameras trained on them. They were seen. Immediately. When the officers went out. They didn't flee. They stayed there. Sergeant Kennard and other officers testified about how any time there were higher priority 911 calls. They couldn't go out to make arrests. This is protocol. Any time there was a large crowd of people. All doing graffiti at the same time. So on this particular security wall. It was routine that people would apply chalk, graffiti, whatever. And periodically or routinely it would be cleaned up. It was cleaned up every day or multiple times a day. And this was observable by video cameras. Depending where it was on the wall. Now, anybody go and look at these cameras and try to identify the people and seek them out and arrest them? No. There were no investigative resources devoted to that. Could I ask, I know you have short on time. But I want to understand another issue. Because I want to ask the other side about it. And that's the Monell issue. So I'm having a little trouble tracing the city policy. And I understand, if I understand your argument, you're saying, well, there is no identifiable longstanding city policy. Is that right? Yes. And the city policy you would be referring to is what precisely? With respect to Monell liability. There is no city custom or practice. The district court relied on testimony by the defendants about a, quote, protestor exception. That was related to the King County Jail's policy. And the district court said that was testimony about a city policy. So I want to ask you about that. So they've got the Seattle police are housing people down at the King County Jail. And there's a cooperative agreement that you can put people there. But it's King County that has this COVID and then added this protestor exception. Right. So the question I had, maybe you can just explain it. Is that imputed then to the city in terms of the city officials and the agreement between the city and the county on housing arrestees? There's all of the evidence at trial was that the officers had to ask the supervisor at the county and the county's own document is consistent with this, which plaintiff introduced as trial exhibit 30, either 36 or 37. That the officers had to ask the county, will you book this person? I see. And then provide an individualized explanation for why the person needed to be booked. So there's no evidence that the city adopts the county policy or that the county policy is the city's policy. It's the county jail. There's no evidence the practice was retaliatory rather than based on the risks posed by crimes within large crowds. There's no evidence that plaintiffs were booked under this exception or anyone else was. Thank you. That's helpful. I'll reserve my time for rebuttal. I'll give you some time for rebuttal. Thank you. Good morning, your honors. May it please the court. Nathaniel Flack for the plaintiff at police. If I may, I'd like to start with some of the Monell issues that your honor was asking about. And just to sort of back up and start with the high level view of the Monell claim and the facts that support it. So it's true that the jail is owned by the county and run by the county. But obviously SPD, as the record bears out, is a repeat player in bringing folks to the jail. And there isn't really evidence that at any point in our case, any of the defendant officers who admit that they made the booking decision, which SPD does make, this decision whether to bring the arrestee from the lockup at the precinct to the jail and have them taken to jail. There's very clear testimony from the officers in this case that they made those decisions. There's testimony from- Yes, there's no dispute about the fact that they took them down there and then had the decision made. But my concern is what do you point to as a longstanding city policy? And I'm not too convinced by the individual from the Office of Human Rights or Civil Rights because she's not really part of the police department. Well, I do think that Ms. Cahill has, as a policy director employed by the city, specifically working on the city's use of the jail, she has knowledge of the customs and practices that the police department is using and its determinations about who to take to the jail. So I do think she said she sheds some light on that. But where do I look? Where's the city policy? So the city policy is to give officers discretion. Where? So there's Exhibit 38 in which SPD essentially forwards the memo from Mr. Diaz, who is the head of the jail. Mr. Diaz addresses this memo to various police chiefs, including the SPD chief, it's undisputed, saying this is how we would like the police departments to treat the jail during COVID. And that's Exhibit 37, that memo from the head of the jail. And that memo is very detailed in terms of what it's requesting from the various police departments. These are the specific offenses, felonies, and certain specified misdemeanors that are subject to booking. And otherwise, there may be exceptions. Exhibit 38 shows that this was circulated internally among the SPD events team. And in any event, it was undisputed at trial. And according to, for example, Sergeant Kennard, who is the – a booking – he's a sergeant. So a big part of his job, according to his testimony, is screening arrests for booking and making these kinds of booking decisions. And according to his testimony, he was aware of these booking restrictions. The city had – But I'm still kind of left with the where's the city policy. I know we got Sergeant Kennard, and we know we have some thing to be credited from Cahill. But where's the city policy? Well, I think – I mean, can you have three or four officers who do A, B, and C, and all of a sudden that constitutes a city policy? I think strictly speaking, you know, I guess I would start looking at Model Instruction 9.5, which was given to the jury in this case and which talks about official policy or widespread or longstanding practice or custom that caused the deprivation of plaintiff's rights. And I think, strictly speaking, our theory, our Monell theory, although it involves high-level policies governing the use of the jail, strictly speaking, it is a practice or custom-type Monell claim. And it's borne out by the testimony of Sergeant Kennard, who was responsible for this and testified. He was instructed about the protester exception at roll call and that he believed it had come up from high in the police department. Multiple officers testified about this. Ms. Cahill had knowledge that this was going on. And even the city's witness on this point, Ms. Agard, I believe it's pronounced a captain in the police department, while characterizing this practice somewhat differently, acknowledged that the city was booking people into jail if they were arrested during a protest. Is there any separate damages, judgment against the city? Separate from the officer. If you look at the verdict form, I don't see dollars and city connected. But maybe I'm missing something. That's right, Your Honor. So there is the city. The jury did specifically find the city separately liable. But under, I think, 1983, this hasn't been briefed, but generally speaking, 1983 compensatory damages are joint and several. And so that is reflected in the way that the verdict form is set forth. But just on the booking issue before moving on from that, unless the court has further questions on it, I wanted to sort of correct the impression that the defendants have given in the brief, which is, I think, to cast doubt on the causation and the chain of events that go to the Monell claim. So, for example, they've testified that, excuse me, they've put in their brief that there was no protest, or it's undisputed that there was no protest on the night of the arrest. And I don't think that's borne out. I think the jury heard testimony from Sergeant Kennard that he perceived this to be a protest. It is written in the police report that was prepared by Officer Nelson documenting the arrests, which was reviewed and approved and signed off on by Sergeant Kennard, that this group of people in front of the precinct was a group of so-called known protesters. And that links up very neatly and logically with the testimony about the protester exception. And the officers responsible for booking were asked about this. And it's clear Officer Patton testified in the sixth volume of the excerpts of record that he believed people arrested at protests didn't need to be screened to be taken to the jail. And indeed, the record is devoid of evidence that anybody was screened in the sense of seeking approval from the jail for the booking. And Officer Nelson gave testimony that was unequivocal that the jury heard, that he used his discretion to take these people to the jail. And I think Ms. Cahill's testimony shed some light on this because she has a higher level view of how the city and the jail interact. But it's ultimately the decision that the jail is ultimately deferring to the officers about who is booked into jail. That is what the testimony bears out here. And the officers' testimony is consistent with that as well, that they make the decision about who is booked. And here it was certainly the most logical and natural inference based on all the testimony about these plaintiffs being protesters and the existence of a protester exception and the undisputed fact that the crime of arrest did not appear on the list of approved booking offenses. You've got to help me here. Monell requires a policy or practice. And you're contending that it was established in this case because of the King County's jail admission policies. Tell me how that connects with the allegedly improper arrest of protesters. Yes, so the county is not a defendant in this case. That's clear. The unconstitutional practice here is the practice attested to by the arresting officers that they, as part of what they called a department shorthand, would book protesters into jail who did not qualify for booking under the policy then in effect, which was to only have certain specified offenses booked into the jail. I'd always thought that Monell required the existence of a policy that allowed, maintained, or influenced the conduct of officials. So I would quote in response to that, Your Honor, I would quote directly from Monell at 436 U.S. at page 690, where the court said that an actionable governmental custom can exist even though such a custom has not received formal approval through the body's decision-making channel. So that word custom, which carries through to the model instruction in this circuit, is drawn directly from Monell itself. And ultimately, as this court held in Trevino v. Gates, the question whether a policy or custom, in the words of the court, exists is a jury question. And I think at a minimum, the logical link between people being arrested who are not on the list of offenses that are supposed to be booked, undisputed. Those people were perceived as being protesters, undisputed based on the police records. Officers testify they understand there to be something called a protester exception, which allows booking. They testify that this was a shorthand within the department, that it came down from higher up within the department. I think that evidence, at a minimum, is sufficient to go to a jury. I think the most logical inference, and certainly a reasonable inference, which the court should credit on review of the denial of a 50B motion, is that that constituted booking into jail because of the content or viewpoint of protected speech. I think you've made the best case you can. We'll see whether you've convinced us. Let me address something else that bothers me about the record in this case, and that is evidence of the political beliefs of the officers. So a couple points on that, Your Honor. I think I would first start out, there's reference in the briefs, the appellant's briefing to this campaign flag that was hanging in the precinct. And we believe that objection is not preserved. The defendants were asked on the record if they objected to the admission of that exhibit, which was ultimately just a body cam video of the arrest of our clients, and they stated there was no objection. And in response to the very limited questions related to that item that can be seen on the wall of the precinct, again, there's no objection. So we don't believe that that issue is preserved for this court's review. But in any event, I don't think it should trouble the court. This is, I think, an area of very limited inquiry at trial. There are just a couple questions which go to the obviously, this is not extraneous evidence that was introduced. We were looking at the video footage that shows our clients being placed under arrest, being locked up inside a cell inside the precinct, and in the course of that, you see what the inside of the precinct looks like. And I don't think the defendants have ever explained why that evidence should be altered or manipulated or somehow changed to prevent the jury from seeing the true appearance of the interior of the precinct. And I obviously subscribe to the proposition that, well, I think the questions here were geared towards the issue of viewpoint, right, which is an issue in issue. The question of viewpoint and of political motivation, in the Gonzalez case, the Supreme Court referred to the basic allegations in the complaint as involving a, quote, unquote, political vendetta. And I don't know if we would go quite that far in describing our case, but I think the Supreme Court's use of that phrase in that case recognizes that in a retaliatory arrest case, very often, the viewpoint is going to come into play. It ultimately has to. And this, I think, the jury saw in the context of not just this flag, but there is, you know, these were materials that were seized from protesters also around the precinct. And so I don't think there's any reason to think that the jury was focused on this. It was not a focus in closing. It was not a focus of questioning of witnesses. But I think it was relevant context. And in any event, defendants' objections to it are not preserved. Another question about the jury, and this goes to the Nieves instruction. So I think the city argues that you have to presume prejudice if you take the position that the jury instruction took away from the jury the question of objective evidence. Because the way it's phrased is, I instruct you there was probable cause, so that then kicks you into this exception. But then goes on to say, plaintiffs have presented objective evidence that officers don't exercise their discretion to arrest people chalking on sidewalks and walls. So the question I have is whether that is a question of law, or is that a question of fact that should have been left to the jury. Thank you, Your Honor. And briefly on that, we do not believe that issue is preserved. Either under the plain language of Rule 51, the defendants, if they object to that instruction, were required to object at the time provided by the court, which was at the final exceptions conference before the final instructions were compiled. And defendants had notice of that conference the day before. That's on the record at the end of the ninth volume of the SCRs. They did not object on the record. They had previously submitted a proposed instruction that included that language. And so we think this is, even before that, defendants had first brought up the idea of instructing the jury about Nieves. So we think this is not only unpreserved under Rule 51, but also invited error. But ultimately, we don't think that, to answer Your Honor's question, the Nieves exception finding is a threshold finding as to a burden of production on summary judgment. So the court is making what I think is probably best characterized as a mixed determination of law and fact. Have plaintiffs come forward with evidence going to this point? Have they produced objective evidence showing that similarly situated people are not arrested? The court properly concluded that we had. And I think it was within the court's discretion not to mention that to the jury. It was within the court's discretion to inform the jury of its rulings on summary judgment, as defendants urged the court to do. And because all of the evidence admitted at trial comported with that instruction, I think the most important point on that issue is just that it couldn't have made any difference to the jury's verdict, whether that instruction was given, because ultimately the jury heard all that evidence itself. And defendants have never suggested how they opposed or in what manner they would have shown that it wasn't true, that they didn't endorse it. Is there evidence in the record that distinguishes between sidewalks and walls? There is no evidence in the record as to any policy distinguishing between sidewalks and walls or distinguishing in any manner between sidewalks and walls. And I think I see that I'm out of time. You can finish the answer, and then we'll see if there's any other questions. Okay. Thank you, Your Honor. So, yeah, there is no evidence supporting that argument from the city that there's some distinction. I think when the court says walls, I think we do need to be careful about that. This was not a wall in the normal sense that people think of a wall, or as that word is typically used. If you look at, I believe it's Trial Exhibit 1, you can see this was what they called eco-blocks or what I think people might commonly call a jersey barrier, but essentially concrete blocks which are placed on the sidewalk, which are not analogous to the actual wall of the courthouse or the wall of a person's house or anything like that. This is a distinctive location. It's on the sidewalk in front of the police precinct. The district court's treating of the public forum analysis informed its conclusion that sidewalks and concrete blocks on top of sidewalks are analogous and similar for Nieves exception purposes. And so we do believe that- Can I ask you a question about that? I'm looking at the wall. It seems like there's a chain link fence there, and then there's a concrete block. Was this some sort of thing that was added on during the protests during COVID to keep protesters away or something? Because it looks rather makeshift. Yes. So what's in the record, I think, is that this whole- these blocks and the fence part of it as well were added earlier in 2020 to keep protesters away. That's right. Thank you. Any other questions? Thank you. I request that the judgment be affirmed. Thank you. Could you address the statement that the jury instruction 19 was not objected to, and so any claim is forfeited on that instruction? Well, we objected orally and submitted a brief on it, and the district court ruled orally once and in writing once. And all that's required is that it be presented in a sufficiently clear manner that a definitive ruling is obtained. Counsel, your friend on the other side said you submitted a jury instruction that had that language in it. Is that true? Yes, Your Honor. Our supplemental brief said because the court has rejected our request, we are submitting an in-the-alternative request. It's crystal clear in our brief that we are making an in-the-alternative request. That does not waive an argument. And we have all the relevant citations in our reply brief. We did not waive the argument. I'm sorry. What supplemental brief? Your supplemental brief on the jury instructions before the district court? Yes. Sorry, Your Honor. It was our supplemental brief on jury instructions that we filed in the district court. And all of the relevant citations are in our reply brief in this court. Okay. So briefly, the video with the flag that— Well, let me just go back to that, though, is that the client's counsel says, well, this is really a threshold question that the court has to determine under the Nieves analysis. What's your view on that? Oh, the Nieves instruction? Well, yeah, because the objective evidence prong of that instruction. Yes, Your Honor. It is a threshold question that was required to be determined at summary judgment. And so is that a legal issue and not a factual issue? I think the threshold question at summary judgment, that was a legal question. The way the Supreme Court talks about it in Nieves and Gonzalez makes it seem like a legal question at summary judgment. However, the—and I believe including it in the jury instruction was a legal error. I don't believe it should be included in the jury instruction. I believe it—regardless of what— So let me just get—because this is actually a pretty significant part of the case. So you're saying that at summary judgment, it was a legal question, so we get past that. Now we're at trial, and the judge is simply repeating the statement basically made as a matter of law in the summary judgment proceeding and saying to the jury, here's the setup. So this was already determined, but then you can take a look at how you think that affects anything. So what is the error there? The Nieves court says after this threshold determination is made, then the case is to proceed as it otherwise would have been under the Mount Healthy framework. And I believe that the reasoning of Nieves makes it clear why this instruction would have been so—was so prejudicial because telling—because the Nieves determination is not telling the district court at summary judgment to determine, is there any genuine dispute of fact? It's telling the district court to determine at summary judgment, is there enough objective evidence to meet a certain threshold? And if there is, then it means it can go to the jury, right? Yes. And so the error here, if you're just restating what has already been decided that there has been a threshold showing on this, what's the prejudice? The prejudice is what it would have caused the jurors to think about the officer's actions. And the Nieves court describes in its reasoning how that—the fact that it is atypical or unusual to make arrests makes it more likely that retaliation would have taken place. That's why it's a threshold determination. And so it puts the thumb on the scale. I think it—that's why I described it as a de facto directed verdict. I believe it was highly prejudicial. Any other questions? No. No. Thank you. I'd like to thank counsel both for arguments and the briefing. Very interesting case, Tucson versus the City of Seattle. We'll be taking a 10-minute recess, and then we'll come back for Washington Department of Health versus GEO Group, so you can get set up for that argument.
judges: McKEOWN, HAWKINS, WARDLAW